# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39999**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Perrion K. BURNETT**
Airman (E-2), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 10 June 2022

———————————

*Military Judge:* Wesley A. Braun (arraignment); Jason M. Kellhofer.

*Sentence:* Sentence adjudged 25 September 2020 by GCM convened at Maxwell Air Force Base, Alabama. Sentence entered by military judge on 15 October 2020: Dishonorable discharge, confinement for 2 months, forfeiture of all pay and allowances, and reduction to E-1.

*For Appellant:* Lieutenant Colonel Garrett M. Condon, USAF; Major Matthew L. Blyth, USAF.

*For Appellee:* Lieutenant Colonel Matthew J. Neil, USAF; Major Alex B. Coberly, USAF; Major Brittany M. Speirs, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, RICHARDSON, and ANNEXSTAD, *Appellate Military Judges*.

Chief Judge JOHNSON delivered the opinion of the court, in which Judge RICHARDSON and Judge ANNEXSTAD joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

JOHNSON, Chief Judge:

A general court-martial composed of officer members convicted Appellant of one specification of sexual assault in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1,2] The court members sentenced Appellant to a dishonorable discharge, confinement for two months, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the adjudged sentence, and the military judge entered the judgment of the court-martial.

Appellant raises 14 issues for our consideration on appeal: (1) whether the evidence is legally and factually sufficient to support his conviction; (2) whether the military judge erred by failing to give a proper instruction on the affirmative defense of involuntary intoxication; (3) whether trial defense counsel were ineffective by failing to research or request a proper instruction on involuntary intoxication; (4) whether the military judge erred by failing to give a proper limiting instruction upon the admission of human lie detector evidence; (5) whether trial defense counsel were ineffective by failing to appreciate the prejudicial effect of human lie detector evidence and failing to request a limiting instruction; (6) whether the military judge erred by failing to give a timely and proper limiting instruction regarding evidence of Appellant's prior waiver of an administrative discharge board; (7) whether trial defense counsel were ineffective by failing to appreciate the prejudicial effect of evidence of Appellant's discharge board waiver and failing to request a limiting instruction; (8) whether the military judge abused his discretion by admitting testimonial hearsay; (9) whether a witness immunity letter issued by the convening authority amounted to unlawful command influence; (10) whether trial counsel engaged in prosecutorial misconduct during argument on findings; (11)

---

[1] References to Article 120, UCMJ, are to the *Manual for Courts-Martial, United States* (2016 ed.). Unless otherwise indicated, all other references to the UCMJ, Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] When Appellant was arraigned on 11 December 2019, he deferred his choice of forum and plea. The proceedings resumed with motion hearings on 17 September 2020, and the panel of officer members was assembled on 21 September 2020. However, Appellant's plea and selection of forum were not readdressed during the court-martial, and the record of the proceedings does not reflect that Appellant entered a plea or forum selection. The court-martial proceeded without objection as if Appellant had pleaded not guilty to the charge and specification and elected to be tried by a panel of officer members. On appeal, Appellant has not raised this omission as an error, and we find this irregularity did not materially prejudice his substantial rights. *See generally* 10 U.S.C. § 859(a); R.C.M. 903; R.C.M. 910(b).

whether trial defense counsel were ineffective by failing to object to trial counsel's argument; (12) whether Appellant was wrongfully denied credit against his sentence for nonjudicial punishment he previously received for the same offense for which he was convicted; (13) whether Appellant is entitled to relief for cumulative error; and (14) whether the military judge abused his discretion by limiting the time allotted for closing argument.[3] For purposes of analysis, our opinion consolidates issues (3), (5), (7), and (11) below. We have carefully considered issue (14) and find it does not require discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). We find no error materially prejudicial to Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND

Appellant and JC, a female active duty Air Force member, became friends in 2016 when they were both stationed at Maxwell Air Force Base (AFB) Gunter Annex in Montgomery, Alabama. Appellant and JC spent time together on a weekly basis and became close friends. In May 2017, Appellant and JC went on a trip to Pensacola, Florida, together with JC's brother and mother, during which all four shared a hotel room and Appellant and JC shared a bed. Appellant and JC, whom Appellant later described as "incredibly gay," did not have a sexual or romantic relationship.

On 28 October 2017, Appellant and JC both attended a Halloween party hosted by a mutual friend, DB, at an off-base apartment. Because JC expected to drink alcohol at the party, she put an air mattress in her car and made plans to sleep in the apartment of Staff Sergeant (SSgt) BS, another friend who lived close to DB in the same apartment complex. JC did drink alcohol at the party, specifically, "jungle juice" which was made from several types of alcohol mixed together with fruit. JC could not later remember how much she drank, but she became intoxicated to the point that she felt ill and vomited. JC later testified her last memory of the party after vomiting was sitting on the floor drinking water and talking to TT, another Airman.

JC's next memory was of waking up lying on her side on her air mattress in SSgt BS's living room. Appellant was lying on the mattress behind her pressed against her back, and his fingers were inside her vagina. JC later testified she could tell it was Appellant behind her because he was more stocky

---

[3] Appellant submitted issues (10) and (11) under seal pursuant to Rule 17.2(b) of this court's Rules of Practice and Procedure. Appellant personally asserts issue (14) pursuant to *United States v. Grostefon*, 12 M.J. 431, 435 (C.M.A. 1982). Appellant's reply to the Government's answer brief withdrew a fifteenth assignment of error Appellant had initially asserted.

and muscular than either of the two individuals who lived in the apartment, SSgt BS and his roommate NH; in addition, she recognized Appellant's heavy breathing. Appellant was reaching underneath JC's skirt and underwear, moving his fingers in and out of her vagina in a manner she later described as "aggressive" but not "painful."

JC testified she was initially "shocked" and could not speak. She then shoved Appellant's chest with her elbow, "jumped up[,] and ran to the bathroom." In the bathroom JC sent a text message to her ex-girlfriend JL, who at that point lived in St. Louis, Missouri, which simply read, "J help." JL did not respond right away. JC then went to SSgt BS's room and lay on the bed next to him. She went to SSgt BS's room because she "knew [she] was not in a position to drive" and "felt like [she] would be safe" from Appellant there. SSgt BS awoke and asked JC if she wanted a pillow, which she declined; he asked if she was "okay" and she nodded her head. SSgt BS then fell asleep. At some point thereafter, while JC was still awake, Appellant entered SSgt BS's bedroom. JC later testified it appeared to her that Appellant intended to lie down on the floor. JC told Appellant to leave, and he did so without saying anything.

JC fell asleep again. When she awoke, SSgt BS was sleeping. JC left the apartment. As she was leaving, JC saw Appellant lying on the air mattress in the living room. JC then drove back to her dorm room; on the way, she was stopped by the police for speeding. JC did not report the incident with Appellant to the officer because she "just wanted to get home" and "just didn't want to talk to [the officer]."

After JC arrived at her dorm room, she received a text response from JL who asked her "What's going on?" JC responded by text, "I slept on an air mattress with [Appellant] and he wouldn't stop groping me and touching me. I just choked." JC also received a group text message from SSgt BS's roommate, NH, indicating JC had left an item behind at the apartment. In response, JC sent a message to NH and the other recipients of the group text, including SSgt BS and another Airman friend, SB, apologizing for rushing out and stating that Appellant was a "predator." JC then showered and slept for most of the remainder of the day.

Two days later, JC spoke with SSgt BS about what had happened. JC then went to the Maxwell AFB Sexual Assault Prevention and Response office, where she made a restricted sexual assault report. That evening JC underwent a sexual assault forensic examination at a civilian medical facility. During the examination, JC provided an account of the sexual assault that was generally consistent with the events described above and with her later testimony at trial. The examination did not disclose any physical injuries or other evidence of sexual assault.

JC blocked Appellant on her social media platforms and did not speak to him again after the incident in SSgt BS's apartment. Days after the examination, JC went to a bar in Montgomery with a group of friends including SB. Appellant arrived while JC was there, which caused her to become upset and tell SB she wanted to leave. JC drove back to her dorm room, and SB rode with her in the passenger seat. During the drive, JC was crying and felt "overwhelmed with emotions." She told SB that she "had woken up with [Appellant's] finger inside [her]." However, neither SB nor anyone else reported the Halloween party incident to law enforcement for several months.

In the summer of 2018, SB did report the incident involving Appellant and JC to Air Force Office of Special Investigations (AFOSI) investigators who were interviewing him regarding unrelated cases. The AFOSI opened an investigation and on 27 September 2018 interviewed Appellant, who waived his rights and agreed to speak with the investigators. During the interview, Appellant stated that he attended the Halloween party in October 2017 and drank alcohol. Appellant told the investigators he remembered waking up on the air mattress in SSgt BS's apartment next to JC, fully clothed and facing away from her. According to Appellant, JC then got off of the mattress and went into SSgt BS's room. Appellant stated he could not remember how he got from the party to the air mattress in SSgt BS's apartment, and he had no memory of having any physical contact with JC on the air mattress. He acknowledged that JC had stopped communicating with him after that night. When the investigators told Appellant they had received information that he had put his fingers in JC's vagina, Appellant maintained he had "no recollection of that at all," but he "had feared that was what happened" and he "was always too like weird or embarrassed to ask [JC]." Appellant also speculated that someone might have caused him to unknowingly ingest some type of drug during the party, because he knew several Airmen at the party who had gotten into trouble for drug abuse; however, he declined to provide the name of anyone he suspected might have drugged him without his knowledge.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citing *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993)), *rev. denied*, ___ M.J. ___, 2022 CAAF LEXIS 278 (C.A.A.F. 12 Apr. 2022).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (internal quotation marks and citation omitted). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Thus, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *Rodela*, 82 M.J. at 525 (second alteration in original) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

Appellant's conviction for sexual assault in violation of Article 120, UCMJ, required the Government to prove: (1) that at or near Montgomery, Alabama, on or about 29 October 2017, Appellant committed a sexual act upon JC by penetrating her vulva with his fingers; (2) that Appellant did so by causing bodily harm, to wit: penetrating JC's vulva with his fingers without her consent; and (3) Appellant did so with the intent to arouse or gratify his sexual desire. *See Manual for Courts-Martial, United States* (2016 ed.), pt. IV, ¶ 45.b.(4)(b). "'[B]odily harm' means any offensive touching of another, however slight, including any nonconsensual sexual act . . . ." Article 120(g)(3), UCMJ, 10 U.S.C. § 920(g)(3). "A sleeping, unconscious, or incompetent person cannot consent." Article 120(g)(8)(B), UCMJ, 10 U.S.C. § 920(g)(8)(B) .

Although not listed in Rule for Courts-Martial (R.C.M.) 916, "[i]nvoluntary intoxication is an affirmative defense under the UCMJ." *United States v. MacDonald*, 73 M.J. 426, 434 (C.A.A.F. 2014). Affirmative defenses (also known as

special defenses)[4] under R.C.M. 916 "include[ ] any special defense which, although not denying that the accused committed the objective acts constituting the offense charged, denies, wholly or partially, criminal responsibility for those acts." R.C.M. 916(a). The test for involuntary intoxication has two parts: "First, that there was an involuntary ingestion of an intoxicant[; a]nd second, due to this ingestion, [the] defendant was unable to appreciate the nature and quality or wrongfulness of his acts." *MacDonald*, 73 M.J. at 437. "[I]ntoxication is involuntary when an accused is unaware of the effect of a drug or substance on him." *Id*. at 437–38 (citing *United States v. Hensler*, 44 M.J. 184, 188 (C.A.A.F. 1996)).

### 2. Analysis

The Government introduced sufficient evidence to prove Appellant's guilt beyond a reasonable doubt. JC testified that she was asleep on the air mattress in SSgt BS's apartment when she awoke to find Appellant was reaching under her skirt and underwear and penetrating her vagina with his fingers. A sleeping or unconscious person cannot consent, and by all accounts Appellant and JC had no prior sexual or romantic relationship. A rational factfinder could conclude JC's subsequent actions—leaving the mattress, texting JL to ask for help, going to sleep in SSgt BS's bedroom, abruptly leaving SSgt BS's apartment, cutting off all contact with Appellant who was previously a close friend, and telling multiple people Appellant had assaulted her—tend to enhance the credibility of her testimony. The court members were able to observe JC's testimony and apparently found her credible.

A rational factfinder could also conclude Appellant's statements to the AFOSI tended to support JC's testimony in significant ways. Appellant confirmed that he was on the air mattress next to JC, and that she arose and left the room without speaking to him. Appellant acknowledged that JC and others had abruptly cut off contact with him after the incident. Although Appellant claimed not to *remember* what had happened before JC got up from the mattress, he did not *deny* that he had penetrated her vagina with his fingers. In fact, when the investigators confronted Appellant with JC's account of the incident, he responded that he "feared that was what happened."

Appellant offers several arguments as to why the evidence is insufficient, but we find them unpersuasive. Given the nature of the offense and the pas-

---

[4] *See United States v. Rich*, 79 M.J. 572, 584 n.7 (A.F. Ct. Crim. App. 2019) (en banc) ("To a significant extent, the terms 'defense,' 'special defense,' and 'affirmative defense' appear to be used interchangeably in various legal authorities to reference the specific defenses enumerated in R.C.M. 916." (citing *United States v. Feliciano*, 76 M.J. 237, 239 n.1 (C.A.A.F. 2017)), *aff'd*, 79 M.J. 472 (C.A.A.F. 2020).

sage of more than two days before JC underwent the sexual assault examination, the absence of physical evidence of sexual assault is unsurprising and casts no substantial doubt on JC's testimony. Moreover, her testimony was that she was asleep, and not merely blacked out, when she awoke to find Appellant actively penetrating her vagina. We find no substantial evidence to indicate JC may have consented but simply could not remember doing so. In addition, contrary to Appellant's assertions, we find the evidence supporting the possibility that Appellant was involuntarily intoxicated by some unknown drug administered by an unidentified person, such that he was unable to appreciate the nature, quality, or wrongfulness of his acts, to be exceedingly weak.

Accordingly, drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's convictions. Additionally, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

## B. Involuntary Intoxication Instruction

### 1. Additional Background

During his AFOSI interview, which the Government introduced at trial, Appellant suggested that his level of intoxication at the October 2017 Halloween party exceeded what he would have expected based on the amount of "jungle juice" he drank. Appellant based this assessment on: his inability to remember a significant portion of the night; information others provided him about his disorderly behavior at the party and afterwards in SSgt BS's apartment—behavior that he stated he could not remember; and a video someone had taken of him at the party, and later showed him, in which his head was "nodding." Appellant told the investigators he had heard that several Airmen who worked in another unit in the same building as he did had gotten into trouble for drug abuse, and some members of that unit were at the party. Appellant speculated that someone at the party may have caused him to ingest drugs without his knowledge. However, when asked, Appellant did not identify anyone he suspected might have done so, nor did he identify anyone he believed abused drugs in general.

At trial, SB—who had also been at the Halloween party—testified he did not see anyone use drugs at the party, although he "had heard that there may have been" drug use going on.[5]

---

[5] SB also testified that he had been administratively separated from the Air Force "due to an allegation of drug use."

After the Defense rested, the military judge discussed the proposed findings instructions with counsel. The military judge indicated he intended to give an instruction on Appellant's voluntary intoxication. Trial counsel then suggested that Appellant's AFOSI interview raised "an issue of maybe involuntary intoxication," and requested "that language be included" with the voluntary intoxication instruction. After some discussion, trial counsel clarified that the Government was not requesting an instruction on the defense of involuntary intoxication itself. After further discussion, the military judge and counsel agreed Department of the Army Pamphlet 27-9, *Military Judges' Benchbook*, ¶ 3-45-15 (10 Sep. 2014), did not contain a model instruction for the affirmative defense of involuntary intoxication. The following colloquy between the military judge and parties then ensued:

> MJ [Military Judge]: Yeah, sorry. To be clear, so ----
>
> DC [Defense Counsel]: I'm sorry.
>
> MJ: ---- I'm not saying I'm asking whether you want [an instruction on involuntary intoxication]. I'm saying if you got one, I would like to hear what it is.
>
> DC: Understood. I'm tracking now. No, we are good with the voluntary intoxication instruction, sir.
>
> MJ: Okay. Well, let me ask, if the members were to determine that, based on the evidence provided, that they believed the individual -- that the accused had been involuntarily intoxicated, the instructions would not provide them any direction. So, I do think it a valid point. Or if they do, where do you think the members would be able to turn?
>
> CTC [Circuit Trial Counsel]: Your Honor, prior to today, I tried to find a case or something in the [Manual for Courts-Martial] that was on point of involuntary intoxication and was not able to find anything, at least, like I said, in military practice.
>
> MJ: Well, the only element it would actually go towards is the same as voluntary intoxication. The only thing it -- I mean, if you presumed, even if you went with the theory or you presumed that an accused had been drugged, for example, and then committed another crime, it would still only go toward the specific intent. All other factors would remain. Would you -- I mean, would you agree with that?
>
> CTC: Yes.

DC: Your Honor, may I propose if you just take out the word "voluntary" and just leave "intoxication," perhaps that would not be as misleading.

MJ: Well, I -- alternatively is simply to say the evidence has raised the issue of voluntary or potentially involuntary intoxication.

DC: That works too.

MJ: I mean, it has been raised by the evidence presented by the [G]overnment.

CTC: Yes, sir.

MJ: Now, I understand the [G]overnment's position is that that's not plausible essentially or something along those lines, but nonetheless ----

CTC: Yes, sir.

MJ: ---- it is a matter for the members to determine. And at the very minimum, again, I could see the members coming back and asking, "Well, what if . . . ," and the instructions would not address that at the moment. So, is there any objection from the [G]overnment or the [D]efense to including, within the voluntary intoxication instruction, "involuntary" as well insofar as that goes towards the element of specific intent to arouse or gratify sexual desire?

CTC: No, sir.

DC: No objection from [D]efense.

After a recess, the military judge stated he had provided counsel written copies of the proposed findings instructions. When he asked whether the parties had "any substantive objections or additions" to the instructions, trial defense counsel responded "No, Your Honor."

The military judge subsequently provided the court members the following instruction with respect to intoxication:

Voluntary and/or involuntary intoxication; the evidence in this case has raised the issue of voluntary or involuntary intoxication in relation to the charged offense. I advised you earlier that one of the elements of the offense of Article 120, [UCMJ,] Sexual Assault, is that the accused penetrated [JC]'s vulva with his finger, but another element was that he must have done so with the specific intent to arouse or gratify his sexual desire.

In deciding whether the accused had such a specific intent at the time, you should consider the evidence of intoxication. The law recognizes that a person's ordinary thought process may be materially affected when he is under the influence of intoxicants. Thus, evidence that the accused was intoxicated may, either alone, or together with other evidence in the case cause you to have a reasonable doubt that the accused had the specific intent to arouse his sexual desire or gratify his sexual desire.

On the other hand, the fact that a person may have been intoxicated at the time of the offense does not necessarily indicate that he was unable to have the specific intent to arouse his sexual desire because a person may be drunk yet still be aware at that time of his actions and their probable results. In deciding whether the accused had the specific intent to arouse his sexual desires and/or to gratify them at the time of the offense, you should consider the effect of intoxication, if any, as well as any other evidence in the case you find relevant to this element.

At the conclusion of the military judge's instructions, he asked counsel whether either party objected or requested additional instructions. Trial defense counsel again responded, "No, Your Honor."

### 2. Law

Whether the military judge correctly instructed the court members is a question of law we review de novo. *United States v. Payne*, 73 M.J. 19, 22 (C.A.A.F. 2014) (citation omitted).

The military judge's instructions on findings "shall include . . . [a] description of any special defense under R.C.M. 916 in issue." R.C.M. 920(e)(3). "Defenses" under R.C.M. 916 "include[ ] any special defense which, although not denying that the accused committed the objective acts constituting the offense charged, denies, wholly or partially, criminal responsibility for those acts." R.C.M. 916(a). "A defense is reasonably raised when 'some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they chose.'" *MacDonald*, 73 M.J. at 434 (quoting *United States v. Stanley*, 71 M.J. 60, 61 (C.A.A.F. 2012)). "Although not expressly listed as an affirmative defense under R.C.M. 916," the United States Court of Appeals for the Armed Forces (CAAF) has recognized that "[i]nvoluntary intoxication is an affirmative defense under the UCMJ," and the military judge has a *sua sponte* duty to instruct on the defense when it is raised by the evidence. *Id*. The defense exists when there was an involuntary ingestion of an intoxicant and, due to this ingestion, an accused "was unable to appreciate the nature and quality or wrongfulness of his acts." *Id*. at 437.

In general, whether an instruction on a special defense is warranted in a particular case is a question of law we review de novo. *See United States v. Davis*, 76 M.J. 224, 229 (C.A.A.F. 2017) (citations omitted). Failure to object to the omission of an instruction forfeits the objection in the absence of plain error. *United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020) (citations omitted). However, where an appellant "affirmatively decline[s] to object to the military judge's instructions and offer[s] no additional instructions," he may thereby affirmatively waive any right to raise the issue on appeal. *Id.* (citations omitted). Even "required findings instructions can be waived." *United States v. Rich*, 79 M.J. 472, 475 (C.A.A.F. 2020) (citations omitted). "Whether an appellant has waived an issue is a legal question we review de novo." *United States v. Schmidt*, 82 M.J. 68, 72 (C.A.A.F. 2022) (citation omitted) (Sparks, J. announcing the judgment of the court).

### 3. Analysis

Appellant contends the military judge failed to provide an accurate instruction on the affirmative defense of involuntary intoxication despite finding such a defense had been raised by the evidence. He contends the military judge plainly misconstrued the nature of involuntary intoxication as an *affirmative* defense which, unlike voluntary intoxication, could potentially exonerate Appellant even if the Government proved "the objective acts constituting the offense charged." R.C.M. 916(a). Appellant notes the military judge failed to instruct on the components of the involuntary intoxication defense as the CAAF explained them in *MacDonald*, specifically (1) involuntary ingestion of an intoxicant and (2) consequent inability of the accused to "appreciate the nature and quality or wrongfulness of his acts." 73 M.J. at 437. Appellant further contends the military judge plainly misstated the law by instructing the court members that evidence of voluntary or involuntary intoxication operated similarly—that is, by potentially creating reasonable doubt that Appellant had the specific intent to arouse or gratify his sexual desire, as charged.

Although we agree the military judge did not provide an accurate instruction on the affirmative defense of involuntary intoxication, it is plain from the record that the Defense waived any objection to this omission. Initially, trial defense counsel stated she had no proposed instruction on involuntary intoxication and was satisfied with the voluntary intoxication instruction. When the military judge expressed concern that the evidence had raised a potential question of involuntary intoxication, such that an instruction on voluntary intoxication alone would leave the members without guidance on involuntary intoxication, trial defense counsel first suggested removing the modifier "voluntary," and then agreed that including the term "involuntary" in the voluntary intoxication instruction was also satisfactory. At the end of the intoxication discussion, trial defense counsel told the military judge she had no objection to

the proposed instruction. She reaffirmed the Defense had no objection or request for additional instructions both after the Defense received a written draft of the findings instructions and after the military judge read the instructions to the court members. Although the military judge evidently believed the evidence raised a question of involuntary intoxication, even required instructions may be waived, and that is what happened here. *See Rich*, 79 M.J. at 475; *see also United States v. Gutierrez*, 64 M.J. 374, 376 (C.A.A.F. 2007) ("[E]ven if an affirmative defense is reasonably raised by the evidence, it can be affirmatively waived by the defense.").

Appellant argues in his brief this court should not find waiver because the military judge and the parties "were not understanding and certainly not analyzing the involuntary intoxication defense on its own, and as such there was no intentional relinquishment of a right by trial defense counsel." *See United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017) ("[W]aiver is the intentional relinquishment or abandonment of a known right." (quoting *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009)). We agree with Appellant that in the discussions quoted above the military judge and counsel appeared focused on modifying the voluntary intoxication instruction—such that it would not mislead the court members to erroneously believe that only voluntary, rather than involuntary, intoxication could raise reasonable doubt regarding Appellant's specific intent. However, this discussion took place in the context of trial defense counsel already having indicated the Defense did not seek an instruction on involuntary intoxication. Trial defense counsel subsequently reaffirmed multiple times that the Defense did not want different or additional instructions on involuntary intoxication. Whether that was a reasonable decision on trial defense counsel's part, and whether trial defense counsel actually misunderstood the law, are separate questions that implicate Appellant's right to effective assistance of counsel, analyzed *infra* as a distinct assignment of error. However, from the military judge's perspective, the Defense plainly waived the matter in terms that were more than sufficient to constitute waiver under our superior court's precedent. *See Rich*, 79 M.J. at 476 ("[W]hen counsel 'affirmatively decline[s] to object' and 'offer[s] no additional instructions,' counsel 'expressly and unequivocally acquiesce[s] to the military judge's instructions,' and his actions thus constitute waiver." (second, third, and fourth alterations in original) (internal quotation marks omitted) (quoting *Davis*, 79 M.J. at 332) (additional citation omitted)).

"[A] valid waiver leaves no error to correct on appeal." *Ahern*, 76 M.J. at 197 (citation omitted). We recognize our authority under Article 66, UCMJ, 10 U.S.C. § 866, to pierce an appellant's waiver in order to address a legal error. *See United States v. Hardy*, 77 M.J. 438, 443 (C.A.A.F. 2018) (citing *United States v. Quiroz*, 55 M.J. 334, 338 (C.A.A.F. 2001)). However, we find no cause

to pierce Appellant's waiver in this situation. First, the military judge's modification to the voluntary intoxication instruction did not result in a materially inaccurate statement of the law. As he and counsel recognized, either voluntary *or* involuntary intoxication could potentially raise a reasonable doubt as to Appellant's specific intent to arouse or gratify his sexual desires. Thus, the instruction actually given with regard to how evidence of intoxication could affect proof of specific intent was not incorrect, so far as it went.

Second, although the military judge and trial counsel evidently believed Appellant's AFOSI interview raised some question of involuntary intoxication, the evidence supporting the *affirmative defense* of involuntary intoxication was almost nonexistent. In order to support the affirmative defense, the evidence was required to show Appellant unknowingly ingested an intoxicant, and as a result of that intoxicant, at the time he penetrated JC's vagina with his fingers he was unable to appreciate either the nature and quality of his acts or the wrongfulness of his acts. There was essentially no substantial evidence anyone was using drugs (other than alcohol) at the Halloween party, much less surreptitiously giving drugs to others, or to Appellant in particular, without their knowledge. Both Appellant (in his interview) and SB (in his testimony) stated they did not see anyone using drugs there. Appellant's behavior, including his purported blackout for a portion of the night, can be accounted for by his consumption of the mixed alcohol in the "jungle juice," a concoction which evidently strongly affected JC as well. Moreover, the evidence that Appellant was able to reach underneath JC's skirt and underwear to "aggressively" move his fingers in and out of her vagina indicates a degree of coordination and intent that does not suggest he was unable to appreciate the nature of his actions. We perceive no prospect that an instruction on involuntary intoxication would have changed the outcome of the court-martial.

To be clear, if the military judge believed the evidence reasonably raised the affirmative defense of involuntary intoxication, then he had an obligation to provide an appropriate instruction on that defense. However, "[a] defendant is entitled to a fair trial but not a perfect one." *Lutwak v. United States*, 344 U.S. 604, 619 (1953). Even if we assume involuntary intoxication was reasonably raised, in light of the Defense's waiver and the state of the evidence, the omission of an instruction on the affirmative defense of involuntary intoxication did not unfairly prejudice Appellant, and no relief is warranted.

## C. Human Lie Detector Evidence

### 1. Additional Background

During his AFOSI interview Appellant denied remembering how he got from the Halloween party to SSgt BS's apartment. He further stated he could not remember anything that happened at SSgt BS's apartment before he woke

up next to JC, facing the opposite direction, when JC got off the mattress and left the room. At a certain point in the interview, the AFOSI investigators became more confrontational with Appellant. Among other statements, they told Appellant they believed he might have penetrated JC's vagina with his fingers; they suggested Appellant's alcohol consumption emboldened him to touch JC while she slept; they said they sensed Appellant felt remorseful; and they questioned why he would not attempt to talk to JC about the incident unless he knew what happened and he was at fault. In response, Appellant maintained that he did not remember any sexual activity with JC and expressed doubt that drinking alcohol would cause him to touch JC without her consent. Appellant endorsed the idea that he acted differently that night than he would usually act when drunk, and he expressed a belief someone may have given him a drug without his knowledge. He told the investigators he did not try to talk to JC because he "didn't know what to do."

At trial, the Government sought to pre-admit Appellant's videorecorded AFOSI interview as Prosecution Exhibit 1. Trial defense counsel did not object. Trial counsel played short portions of Prosecution Exhibit 1 during the Government's opening statement; during the testimony of Investigator SC, who had interviewed Appellant; and during the Government's closing argument. Trial defense counsel did not object to these uses of the exhibit.

During the direct examination of Investigator SC, trial counsel did not elicit testimony as to whether the investigator believed Appellant's statements. During cross-examination, trial defense counsel questioned Investigator SC about Appellant's interview, and the following colloquy occurred:

> Q. [Defense Counsel] And even though he told you what he believed to remember, you still engaged in some back and forth with him. Is that right?
>
> A. [Investigator SC] Yes.
>
> Q. And you told him you thought he knew what he did. Is that right?
>
> A. Yes, ma'am.
>
> Q. And when you were saying that you were alluding to [JC]'s allegation. Is that correct?
>
> A. Yes, ma'am.
>
> Q. And also, you said to him, "I think this is something that happened."
>
> A. Yes.
>
> Q. In that was referring to the alleged assault.

A. Yes, ma'am.

. . . .

Q. At that point in time when you said to him, "I think this is something that happened," alluding to the allegation made by [JC], at that point you determined he was guilty.

A. That's -- I don't think that's what I meant by the question. I was referring to what I had heard from other people, which I think I referred to throughout the interview of this is what I think based on what people have told us already.

The military judge did not provide, and trial defense counsel did not request, a specific limiting instruction with regard to Prosecution Exhibit 1. However, with the concurrence of both parties the military judge provided the following as part of his instructions to the court members on findings:

A witness's opinion on credibility or guilt, or an inference of that witness's belief: only you, the member of the court, determine the credibility of the witnesses and what the facts of this case are. No witness can testify that the alleged victim's account of what occurred is true or credible, that the witness believes the alleged victim, or that the sexual offense occurred. To the extent you believe that [JL] and/or [SB], or Investigator [SC] testified or implied that he or she believed the alleged victim, that he or she believed that a crime occurred, or that he or she believed that the alleged victim is credible, you may not consider these as evidence that a crime occurred or that the alleged victim is, in fact, credible.[6,7]

**2. Law**

We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *United States v. Bowen*, 76 M.J. 83, 87 (C.A.A.F. 2017) (citation omitted). "When the defense fails to object to the admission of specific evidence," we review for plain error. *United States v. Maynard*, 66 M.J. 242, 244 (C.A.A.F. 2008) (citations omitted). "The plain error standard is met when

---

[6] Trial counsel suggested that Investigator SC be included in this instruction, and the Defense agreed.

[7] For this quoted language, there are minor differences between the certified transcript and the audio recording. The court is quoting from the audio recording, which is part of the record of trial. *See* R.C.M. 1112(b)(1); *see also* R.C.M. 1112(f)(1)(8) (noting that any transcription of proceedings is attached to the record of trial before the record is forwarded for appellate review).

'(1) an error was committed; (2) the error was plain, or clear, or obvious; and (3) the error resulted in material prejudice to substantial rights.'" *Id.* (quoting *United States v. Hardison*, 64 M.J. 279, 281 (C.A.A.F. 2007)). The appellant bears the burden to demonstrate all three prongs of the plain error test have been met. *Id.* (citation omitted).

"Human lie detector evidence is elicited when a witness provides 'an opinion as to whether [a] person was truthful in making a specific statement regarding a fact at issue in the case.'" *United States v. Martin*, 75 M.J. 321, 324 (C.A.A.F. 2016) (alteration in original) (quoting *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014)). If a witness does not expressly state whether he believes a person is truthful, "we examine the testimony to determine if it is the 'functional equivalent of' human lie detector testimony.'" *Id.* (quoting *United States v. Brooks*, 64 M.J. 325, 329 (C.A.A.F. 2007)).

> Testimony is the functional equivalent of human lie detector testimony when it invades the unique province of the court members to determine the credibility of witnesses, and the substance of the testimony leads the members to infer that the witness believes the victim is truthful or deceitful with respect to an issue at trial.

*Id.* at 324 (citing *United States v. Mullins*, 69 M.J. 113, 116 (C.A.A.F. 2010) (additional citation omitted)). Human lie detector evidence and its functional equivalent are inadmissible at a court-martial. *See id.* at 325 (citing *Knapp*, 73 M.J. at 36). "If a witness offers human lie detector testimony, the military judge must issue prompt cautionary instructions to ensure that the members do not make improper use of such testimony." *United States v. Kasper*, 58 M.J. 314, 315 (C.A.A.F. 2003) (citations omitted). However, "we will not find reversible error from the introduction of human lie detector evidence at trial when the accused invites its admission." *Martin*, 75 M.J. at 325 (citations omitted). "The question of whether trial defense counsel invited an error at trial is a question of law, which we review de novo." *Id.* (citation omitted).

An appellant "cannot create error and then take advantage of a situation of his own making. Invited error does not provide a basis for relief." *United States v. Raya*, 45 M.J. 251, 254 (C.A.A.F. 1996) (citation omitted); *see also United States v. Eggen*, 51 M.J. 159, 162 (C.A.A.F. 1999) (citing *Raya*). Invited error is a question of law which we review de novo. *Martin*, 75 M.J. at 325.

"For a nonconstitutional error . . . the Government has the burden of demonstrating that 'the error did not have a substantial influence on the findings.'" *United States v. Berry*, 61 M.J. 91, 97 (C.A.A.F. 2005) (quoting *United States v. McCollum*, 58 M.J. 323, 342 (C.A.A.F. 2003)) (additional citation omitted). "In evaluating whether erroneous admission of Government evidence is

harmless, this court uses a four-part test, weighing: (1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question." *Id.* at 98 (citation omitted).

### 3. Analysis

Appellant contends the military judge failed to give timely and proper limiting instructions after admitting human lie detector evidence, specifically Appellant's AFOSI interview admitted as Prosecution Exhibit 1. Appellant emphasizes several statements by the investigators during the interview indicating that they believed the allegation Appellant had penetrated JC's vagina was likely true, and that they doubted Appellant's claim that he did not remember touching JC on the air mattress. Appellant notes that the military judge did not provide limiting instructions when portions of Prosecution Exhibit 1 were published to the court members at various points in the court-martial. Appellant then contends the general instruction on witness opinions as to credibility or guilt regarding JL and SC, as well as Investigator SC, was "far too little and far too late."

Because the Defense did not object to Prosecution Exhibit 1, we review the question of whether the military judge abused his discretion by admitting it, and by failing to provide specific limiting instructions, under the plain error standard. We find Appellant has failed to demonstrate he is entitled to relief.

First, it is not "plain, clear, or obvious" that the investigators' statements during the interview were the functional equivalent of human lie detector testimony. In context, their challenges to Appellant's statements can reasonably be understood as an investigative tactic to pressure Appellant and explore what he might admit to, rather than a sincere expression of belief. Indeed, on cross-examination, Investigator SC resisted the suggestion that she had, at that point, decided the allegation was true.

Second, assuming *arguendo* that Prosecution Exhibit 1 did contain human lie detector evidence, an appellant is not entitled to relief for invited errors. Trial defense counsel not only failed to object to Prosecution Exhibit 1, but elicited on cross-examination that Investigator SC told Appellant that she believed the allegation was true, and attempted (unsuccessfully) to get Investigator SC to state she did in fact believe the allegation at that point. Trial defense counsel's decisions to not object to Prosecution Exhibit 1 and to cross-examine Investigator SC on whether she believed the allegation were evidently part of the Defense's strategy to portray the AFOSI investigation as biased and

unreliable. The Defense cannot reasonably elicit such evidence as part of a deliberate trial strategy, and then on appeal complain about its effects on the court-martial.[8]

Third, further assuming for purposes of analysis that the military judge should have *sua sponte* provided a limiting instruction when Prosecution Exhibit 1 was admitted or published, Appellant fails to demonstrate such an error had a substantial influence on the findings. As an initial matter, in his findings instructions the military judge specifically instructed the court members not to consider any opinion expressed by Investigator SC as evidence that JC was credible or that a crime occurred. *See United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000) (holding court members are presumed to follow instructions absent evidence to the contrary).[9] Furthermore, applying the four factors the CAAF articulated in *Berry*, for the reasons stated above in relation to legal and factual sufficiency we find the Government's case was strong, based on JC's credible testimony reinforced by her observed behavior, prior consistent statements, and Appellant's admission that he "feared" he might have inappropriately touched her. Similarly, the Defense's case was relatively weak. Appellant's admissions put him next to JC on the air mattress; he also claimed he could not remember what happened, but did not deny he penetrated JC's vagina with his fingers.

Materiality also weighs against finding prejudice. Materiality "is a multi-factored test looking at the importance of the issue for which the evidence was offered in relation to the other issues in [the] case; the extent to which the issue is in dispute; and the nature of the other evidence in the case pertaining to th[at] issue." *United States v. Ellerbrock*, 70 M.J. 314, 318 (C.A.A.F. 2011) (second alteration in original) (internal quotation marks and citation omitted). Here, the materiality of the investigators' statements *as human lie detector evidence* was low, both because the Defense itself specifically introduced similar evidence, and because Investigator SC disavowed that her comments expressed an actual belief that Appellant was guilty. Finally, we find the quality of the evidence neither favors nor disfavors a finding of prejudice. The evidence—i.e., the recording of the investigators' statements—was clear. However, the actual significance of the investigators' statements in the context of the interview was as an investigative tactic to challenge Appellant's statements, which was not particularly successful. In fact, it may have tended to

---

[8] Whether such a strategy amounted to ineffective assistance of counsel is a separate question, addressed *infra*.

[9] In *United States v. Kasper*, 58 M.J. 314 (C.A.A.F. 2003), where the CAAF found reversible error and upon which Appellant relies, the opinion does not indicate the military judge gave an equivalent instruction.

assist the Defense in that Appellant stuck to his claim that he did not remember committing the alleged offense, even after the investigators became more confrontational.

Accordingly, Appellant has failed to demonstrate he is entitled to relief for improper admission of human lie detector evidence.

## D. Administrative Discharge Board Waiver

### 1. Additional Background

During trial counsel's direct examination of JC, the military judge held an Article 39(a), UCMJ, 10 U.S.C. § 839(a), hearing to address a defense objection. After the military judge ruled on the objection, trial defense counsel took the opportunity to inform the military judge the Defense wanted to cross-examine JC about "her initial desire to dispose of this case with an Article 15[, UCMJ, 10 U.S.C. § 815, nonjudicial punishment] and a[n administrative] discharge versus now we are here at a court-martial." The military judge agreed the Defense would be able to cross-examine JC regarding her lack of desire to report the offense or participate in an investigation. However, he opined that "[g]etting into her desire that it be a discharge or [a letter of reprimand] or a court-martial" would be a "collateral" matter. The military judge added the Defense was "free to cross-examine [JC] on any versions she has given of events, absolutely. But how does it go to her credibility that she was, you know, she wanted a greater outcome as a potential victim of a crime? I don't see how that goes towards her credibility . . . ." Trial defense counsel responded, "I understand, sir."

During cross-examination, trial defense counsel elicited from JC that she initially did not want to report the sexual assault to law enforcement or her chain of command, and when the AFOSI began its investigation in July 2018 it was because SB reported it. JC further agreed that prior to August 2019 she "did not desire to have to testify in court;" however, that desire changed in August 2019, and she then agreed to be interviewed by the AFOSI. Trial defense counsel asked JC why she changed her mind, and the following colloquy ensued:

> A. [JC] We were -- in August of 2019, we were supposed to be going to a discharge board, but [Appellant] decided that he wanted to waive the board completely, and I felt that he was a coward for trying to do that and I was mad.
>
> Q. [Defense Counsel] Okay. So, initially it was supposed to be a discharge board, and then ----
>
> A. Yes, ma'am.
>
> Q. ---- and then it changed to court-martial ----

20

A. Correct.

Q. ---- after that date.

A. Yes, ma'am.

On redirect examination, trial counsel followed up on why JC changed her mind:

Q. [Trial Counsel] You also mentioned that at some point you changed your mind and you decided you were going to go ahead and participate in this process. You mentioned that you were mad.

A. [JC] Yes.

Q. And that you believed the accused was a coward.

A. Yes.

Q. Why did you feel that way?

A. Because he had the option to do a discharge board and face -- I guess face the music and listen to me talk, and he waived the board completely, like he didn't even try. And I had went through this whole process, at least like the interview process with you, well, the [G]overnment. And I don't know, it was kind of therapeutic, and I was like well, maybe this -- maybe I can do this. I kind of questioned my ability to be up here.

Q. Was it important to you that he heard what you had to say?

A. Yes.

Trial defense counsel revisited the discharge board waiver during recross-examination:

Q. [Defense Counsel] You testified that you believed the accused was -- I'm sorry, [Appellant] was a coward. Is that right?

A. [JC] Yes.

Q. And why did you say that?

A. Because I felt that he waived the board because he didn't want to be in front of a room full of people telling him what he did.

. . . .

Q. [JC], do you know why [Appellant] was facing a discharge board and not a court-martial?

A. Because I still had a restricted report up until that point and hadn't gave [sic] any testimony to [AF]OSI.

Q. So, you still had a restricted report up until that point. After he waived the board, did you then unrestrict the report?

A. Yes, ma'am. That week.

Q. And so, you unrestricted the report that very week ----

A. Yes, ma'am.

Q. ---- that he was supposed to go to a discharge board?

A. Yes, ma'am.

Q. He submitted a waiver which means he would waive the board in exchange for the worst service characterization.

A. Correct.

Q. Which was an under other than honorable service characterization.

A. Yes, ma'am.

Q. And that was not acceptable to you.

A. Yes, ma'am.

The military judge did not provide a specific limiting instruction with regard to the references to an administrative discharge board and waiver submission, either at the time of JC's testimony or in his instructions on findings; nor did the Defense request such an instruction.

In closing argument, trial defense counsel referred to JC's testimony about the administrative discharge board waiver:

[AF]OSI became aware of this allegation by a third party, [SB], as he was being investigated in part of something entirely different. At the time when [AF]OSI did the follow-up with [JC], she had no desire to move forward. She indicated this to [AF]OSI. She hadn't gone to [AF]OSI prior to. She didn't want to have to testify in court. And she only agreed to move forward with this court-martial after [Appellant] exercised his legal right to waive his board. . . .

. . . .

. . . There was effort by [JC] to distance from [the alleged sexual assault] and not report for the first 2 years. And then she reached a point where she had the exit by way of the board, but she testified that she wanted to be heard. But when [Appellant] elected to waive his board, she got mad. She got mad. You saw it on the stand. She called him a coward. . . .

### 2. Law

We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *Bowen*, 76 M.J. at 87. When the defense fails to object to the admission of evidence, we review for plain error. *Maynard*, 66 M.J. at 244. Similarly, failure to object to the omission of an instruction forfeits the objection in the absence of plain error. *See Davis*, 79 M.J. at 331. However, an appellant who "affirmatively declined to object to the military judge's instructions and offered no additional instructions" may waive any right to raise the issue on appeal. *Id.* (citations omitted). Whether an appellant has waived an issue is a legal question we review de novo. *Id.*

Military Rule of Evidence 410 provides, in pertinent part:

> Evidence of the following is not admissible against the accused who made the plea or participated in the plea discussions: . . . any statement made during plea discussions with the convening authority, staff judge advocate, trial counsel or other counsel for the [G]overnment if the discussions did not result in a guilty plea or they resulted in a later-withdrawn guilty plea.
>
> . . .
>
> A "statement made during plea discussions" includes a statement made by the accused solely for the purpose of requesting disposition under an authorized procedure for administrative action in lieu of trial by court-martial . . . .

"'[A]n excessively formalistic or technical approach to [Mil. R. Evid. 410] may undermine' the policy of the rule, which is 'to encourage the flow of information during the plea-bargaining process.'" *United States v. Vasquez*, 54 M.J. 303, 305 (C.A.A.F. 2001) (quoting *United States v. Barunas*, 23 M.J. 71, 75–76 (C.M.A. 1986)).

"Invited error does not provide a basis for relief." *Raya*, 45 M.J. at 254. Invited error is a question of law which we review de novo. *Martin*, 75 M.J. at 325.

### 3. Analysis

On appeal, Appellant asserts the military judge committed plain error when he failed to give a timely limiting instruction regarding the evidence of Appellant's decision to waive his administrative discharge board hearing. We find Appellant is entitled to no relief on this basis.

As an initial matter, Appellant's references to Mil. R. Evid. 410 are inapt. Although we recognize our superior court has discouraged an excessively for-

malistic or technical approach to such questions, in this case there is no indication that Appellant's decision to waive his administrative discharge board was part of a negotiation for administrative action in lieu of trial by court-martial. The evidence indicates Appellant received nonjudicial punishment followed by an administrative discharge action because JC initially declined to cooperate with the AFOSI investigation, inhibiting a court-martial prosecution. We note the charge and specification in this case were not preferred until 3 September 2019, *after* JC changed her mind and agreed to an AFOSI interview when she learned Appellant had waived the board. Thus, Appellant's board waiver was not in the context of anticipated court-martial proceedings and did not fall under Mil. R. Evid. 410.

Of course, this conclusion is not to say that references to Appellant's administrative discharge process or waiver were not objectionable or should have been admitted—merely that Mil. R. Evid. 410 was not the applicable rule to exclude them. Had an objection been made, the military judge might have reasonably concluded that such evidence was not relevant to the court-martial proceedings, or that any probative value was substantially outweighed by the risks of unfair prejudice or other considerations. *See* Mil. R. Evid. 401; Mil. R. Evid. 403. The military judge's comments to trial defense counsel during the Article 39(a), UCMJ, hearing preceding JC's cross-examination suggest he was inclined to such a view.

More to the point, trial defense counsel's actions implicate the invited error doctrine. The Defense elicited JC's testimony that she changed her mind about cooperating with the AFOSI because Appellant waived his discharge board. Rather than object or seek a limiting instruction or other relief, trial defense counsel had JC reiterate that Appellant was initially facing a discharge board rather than a court-martial. This opened the door to trial counsel following up with JC regarding the discharge board and waiver during redirect examination; again, trial defense counsel did not object or seek an instruction. Instead, the Defense returned to the same point on recross-examination and had JC confirm once again that she decided to cooperate with AFOSI after Appellant waived an administrative discharge board. Trial defense counsel then specifically invoked this evidence during closing argument in order to emphasize Appellant was initially facing only an administrative discharge board and to portray JC as unreasonably biased against Appellant. As with Appellant's claim of error regarding human lie detector evidence, the Defense cannot reasonably

deliberately elicit evidence at trial and then complain about its admission on appeal.[10]

Finally, to the extent Appellant's specific complaint is that the military judge did not provide limiting instructions regarding the references to the discharge board waiver, we note trial defense counsel told the military judge the Defense did not object to the findings instructions or request additional instructions. We find the Defense thereby waived an objection to the omission of an instruction regarding Appellant's discharge board waiver. *See Davis*, 79 M.J. at 331. Recognizing our authority under Article 66, UCMJ, 10 U.S.C. § 866, to pierce Appellant's waiver in order to address a legal error, we decline to do so under the circumstances of this case. *See Hardy*, 77 M.J. at 443.

## E. Testimonial Hearsay

### 1. Additional Background

On 20 September 2020, during Appellant's court-martial, the convening authority signed a memorandum entitled "Grant of Testimonial Immunity for witness not subject to the UCMJ" directed to SB, who was no longer in the Air Force at that point. The first paragraph of the memorandum read:

> SCOPE OF IMMUNITY: An investigation revealed you have knowledge of an offense allegedly committed by [Appellant]. The offense in question involves the alleged sexual assault of [JC] on or about 27 October 2017. You observed [Appellant] and [JC's] interactions with each other on the night of the alleged sexual assault. You also received text messages from [JC] the following morning related to [Appellant]. Several days after 27 October 2017, [JC] confided with you while in your vehicle that [Appellant] had sexually assaulted her.

The second paragraph explained that the convening authority, acting pursuant to authority conferred by Rule for Courts-Martial 704 and 18 U.S.C. § 6004, ordered SB to answer questions by investigators and counsel and to testify in any UCMJ proceeding regarding the matters identified in the first paragraph. The final paragraph of the memorandum explained that SB's answers and testimony could not be used against him in later federal, state, or military criminal proceedings, with certain exceptions including, *inter alia*, prosecution for perjury or making false statements.

---

[10] Once again, whether it was reasonable for trial defense counsel to pursue such a course is one element of Appellant's claim that he received ineffective assistance of counsel, addressed *infra*.

At trial, the Government provided notice of its intent to introduce the immunity memorandum as Prosecution Exhibit 6. Trial defense counsel objected to the last two sentences of the first paragraph as inadmissible hearsay. After some discussion, trial counsel responded that the first paragraph was being offered for the truth of the matters asserted "[o]nly to the extent that it is a direction to [SB] to testify truthfully." The military judge overruled the objection and explained:

> [I]nsofar as paragraph 1 and those two sentences are being offered for the truth of the matter, rather they are being asserted as to why this individual is being given immunity. So, I do not find that those statements are hearsay based off of that purpose and reasoning for the entry here. As far as a [Military Rule of Evidence] 403 analysis goes, absent the testimony of [SB] I would find this prejudicial. But given the fact that [SB] is going to be testifying explicitly to these items and will be subject to cross-examination, I find the prejudicial value extremely mitigated. Additionally, there has been testimony from [JC] as to these facts, further mitigating the prejudicial value of them otherwise coming in only through [the convening authority]. So, therefore I will allow Prosecution Exhibit 6 as it stands, and the objection is therefore overruled on those bases.

Trial counsel subsequently introduced Prosecution Exhibit 6 through the testimony of SB. In his instruction to the court members on findings, the military judge explained the significance of a grant of testimonial immunity. However, he did not provide a specific limiting instruction regarding why the information in the first paragraph of Prosecution Exhibit 6 had been admitted or how the court members were to consider that information.

**2. Law**

We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *Bowen*, 76 M.J. at 87. "An abuse of discretion occurs when a military judge either erroneously applies the law or clearly errs in making his or her findings of fact." *United States v. Donaldson*, 58 M.J. 477, 482 (C.A.A.F. 2003) (citing *United States v. Humpherys*, 57 M.J. 83, 90 (C.A.A.F. 2002)). "[T]he abuse of discretion standard of review recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range." *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004) (citation omitted). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous.'" *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (quoting *United States v. Miller*,

46 M.J. 63, 65 (C.A.A.F. 1997); *United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987)).

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. "Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington*, 541 U.S. 36, 59 (2004). "[A] statement is testimonial if 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *United States v. Sweeney*, 70 M.J. 296, 301 (C.A.A.F. 2011) (quoting *United States v. Blazier*, 68 M.J. 439, 442 (C.A.A.F. 2010)). Whether a statement is testimonial for purposes of the Sixth Amendment is a question of law we review de novo. *United States v. Baas*, 80 M.J. 114, 120 (C.A.A.F. 2020) (citation omitted).

In general, "hearsay" is a statement "the declarant does not make while testifying at the current trial or hearing" that "a party offers in evidence to prove the truth of the matter asserted in the statement." Mil. R. Evid. 801(c). Hearsay is not admissible in a court-martial unless otherwise provided by federal statute or the Military Rules of Evidence. Mil. R. Evid. 802.

The military judge may exclude relevant evidence that is otherwise admissible if its probative value is substantially outweighed by a countervailing concern, including, *inter alia*, unfair prejudice, confusion of the issues, misleading the members, or cumulativeness. Mil. R. Evid. 403. "A military judge enjoys 'wide discretion' in applying Mil. R. Evid. 403." *United States v. Harris*, 46 M.J. 221, 225 (C.A.A.F. 1997) (quoting *United States v. Rust*, 41 M.J. 472, 478 (C.A.A.F. 1995)). "When a military judge conducts a proper balancing test under Mil. R. Evid. 403, the ruling will not be overturned unless there is a 'clear abuse of discretion.'" *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000) (quoting *United States v. Ruppel*, 49 M.J. 247, 250 (C.A.A.F. 1998)).

Non-constitutional errors in the admission of evidence are tested for whether the error had a substantial influence on the result of the trial. *Berry*, 61 M.J. at 97.

**3. Analysis**

Appellant contends the military judge erred by admitting Prosecution Exhibit 6 in its entirety because it contains "textbook testimonial hearsay statements," and because the court members "will naturally presume as true any statements of fact made by the Convening Authority." Recognizing that the abuse of discretion standard is a "strict" one that permits the trial judge to select from a range of reasonable choices, we find Appellant has failed to demonstrate an abuse of discretion.

Hearsay is defined, in part, by the purpose for which the evidence is offered. Statements that would otherwise constitute hearsay—including testimonial hearsay generally prohibited by the Sixth Amendment, if offered to prove the truth of the matter asserted—may nevertheless be admissible if offered for a non-hearsay purpose. The military judge explained, albeit somewhat inarticulately, that the statements at issue in the first paragraph of Prosecution Exhibit 6 were not being offered to prove the truth of the events described, but to explain or define the scope of the immunity which SB had been provided for his testimony. The fact that SB was testifying under an order to testify and grant of testimonial immunity was a relevant consideration for the court members in evaluating the credibility of his testimony. Thus, the convening authority's memorandum defining the scope of that immunity, including the first paragraph, had some modest non-hearsay relevance in Appellant's trial.

Furthermore, we find the military judge's determination that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice was not clearly unreasonable or clearly erroneous. We agree with the military judge that the testimony of JC and proffered expected testimony of SB put Prosecution Exhibit 6 into its proper context and greatly mitigated any unfair prejudice from factual statements therein. The paragraph in question refers to the "alleged" sexual assault. In context, the court members would understand the convening authority was defining the scope of SB's immunity based on information SB had previously provided, rather than making assertions of fact.

Assuming *arguendo* the military judge did abuse his discretion and the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, applying the four-part test articulated in *Berry*, 61 M.J. at 97, we find any such error did not have a substantial influence on the findings. As described above, the Government's case was strong and the Defense's case was relatively weak. The materiality and quality of the evidence also weigh in favor of harmlessness. Prosecution Exhibit 6 was not offered or used as substantive evidence. The challenged portions of the document summarized information that SB had previously provided to investigators, and were generally consistent with the testimony JC and SB provided at trial. Moreover, SB's testimony regarding the "normal" interaction between JC and Appellant at the Halloween party, and about JC's subsequent text message and statements about the sexual assault, were not directly attacked at trial.

However, we pause to underscore several points. We are not oblivious to the potential prejudicial effects of putting before court members a memorandum signed by the convening authority which includes statements about the evidence at issue in a court-martial. A different military judge might reasonably have found the potential for unfair prejudice in the two sentences at issue

did substantially outweigh the probative value of the exhibit for the court members. Relatedly, we again note the military judge did not provide a specific limiting instruction as to how the court members should use this evidence which was admitted for a limited purpose. Although not requested by the Defense, such an instruction would have been appropriate to ensure the court members understood why Prosecution Exhibit 6 had been admitted and how they were to consider it. *See* Mil. R. Evid. 105 ("If the military judge admits evidence that is admissible against a party or for a purpose—but not against another party or for another purpose—the military judge, *on timely request*, must restrict the evidence to its proper scope and instruct the members accordingly." (Emphasis added)); *cf. Davis*, 79 M.J. at 331 (finding waiver where the defense affirmatively declined to object to the military judge's instructions and offered no additional instructions). Nevertheless, for the reasons stated above, under the circumstances of this case we find the military judge did not abuse his discretion by admitting Prosecution Exhibit 6.

**F. Unlawful Command Influence**

Appellant raises a separate assignment of error related to Prosecution Exhibit 6—that the convening authority's recitation of events in the first paragraph, quoted above, amounted to unlawful command influence (UCI) over Appellant's court-martial proceedings. Appellant concedes the "immunized witness must be oriented to the topic and the limits of what the immunity covers," but contends in this case the convening authority went much further and specifically described the testimony he expected SB to provide. Appellant contends Prosecution Exhibit 6 had, at a minimum, the appearance of ordering SB to provide specific testimony—not merely to tell the truth, but to use the words indicated by the convening authority.

Unlawful command influence is prohibited by Article 37, UCMJ, 10 U.S.C. § 837.[11] An appellate court "reviews allegations of unlawful command influence, including allegations of the appearance of unlawful command influence, de novo." *United States v. Proctor*, 81 M.J. 250, 255 (C.A.A.F. 2021) (citations omitted). Under the previous version of Article 37, UCMJ, "[t]wo types of unlawful command influence c[ould] arise in the military justice system: *actual* unlawful command influence and *the appearance of* unlawful command influence." *United States v. Boyce*, 76 M.J. 242, 247 (C.A.A.F. 2017). Actual UCI "is an improper manipulation of the criminal justice process which negatively affects the fair handling and/or disposition of a case." *Id.* (citations omitted). In

---

[11] References to Article 37, UCMJ, are to the version in effect with respect to allegations of UCI committed on or after 20 December 2019, following the enactment of the National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116–92, § 532 (2019).

order to demonstrate actual UCI, an appellant "must show: (1) facts, which if true, constitute unlawful command influence; (2) that the proceedings were unfair; and (3) that the unlawful command influence was the cause of the unfairness." *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013) (citation omitted). "[T]he initial burden of showing potential unlawful command influence is low, but is more than mere allegation or speculation." *Id.* (citation omitted).

> Once an issue of unlawful command influence is raised by some evidence, the burden shifts to the [G]overnment to rebut an allegation of unlawful command influence by persuading the Court beyond a reasonable doubt that (1) the predicate facts do not exist; (2) the facts do not constitute unlawful command influence; or (3) the unlawful command influence did not affect the findings or sentence.

*Id.* (citing *United States v. Biagase*, 50 M.J. 143, 151 (C.A.A.F. 1999)).

Unlike actual UCI, a meritorious claim of an appearance of UCI did not require prejudice to an accused; rather, the prejudice was the adverse impact to the "public's perception of the fairness of the military justice system as a whole." *Boyce*, 76 M.J. at 248–49. As with actual UCI, "when an appellant assert[ed] there was an appearance of unlawful command influence," the appellant was required to initially "show 'some evidence' that unlawful command influence occurred." *Id.* at 249 (footnote and citations omitted). "'[S]ome evidence' of an appearance of unlawful command influence" exists when conduct "ha[s] the potential to appear to 'coerce or . . . influence' the outcome" of a court-martial. *United States v. Bergdahl*, 80 M.J. 230, 236 (C.A.A.F. 2020) (omission in original) (internal quotations marks omitted) (quoting *Boyce*, 76 M.J. at 249, 253). If the Government failed to rebut an appellant's factual showing, it could still prevail against a claim of apparent UCI if it proved "beyond a reasonable doubt that the unlawful command influence did not place 'an intolerable strain' upon the public's perception of the military justice system and that 'an objective, disinterested observer, fully informed of all the facts and circumstances, would [*not*] harbor a significant doubt about the fairness of the proceeding.'" *Boyce*, 76 M.J. at 249 (alteration in original) (quoting *Salyer*, 72 M.J. at 423).

Effective 20 December 2019, Congress modified Article 37, UCMJ, to provide: "No finding or sentence of a court-martial may be held incorrect on the ground of a violation of this section unless the violation materially prejudices the substantial rights of the accused." 10 U.S.C. § 837(c); *see* National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116–92, § 532 (2019). The CAAF has not yet addressed how this statutory change has altered its prior doctrine on apparent UCI. *See United States v. Horne*, ___ M.J. ___, 2022 CAAF LEXIS 356, at *1 n.1 (C.A.A.F. 13 May 2022); *United States v. Proctor*, 81 M.J.

250, 255 n.3 (C.A.A.F. 2021). However, two of our sister courts have concluded the statutory change has "vitiate[d]" the doctrine of apparent UCI by requiring a Court of Criminal Appeals find material prejudice to the appellant's substantial rights in order to set aside findings or sentence due to UCI. *United States v. Gattis*, 81 M.J. 748, 754–55 (N.M. Ct. Crim. App. 2021); *see also United States v. Alton*, ARMY 20190199, 2021 CCA LEXIS 269, at \*13 n.5 (A. Ct. Crim. App. 2 Jun. 2021) (unpub. op.) (noting "[t]he change would seem to vitiate the current apparent UCI 'intolerable strain/disinterested observer' jurisprudence" but "[w]hether there is anything left of the apparent UCI doctrine . . . is a question for another day").

We agree with our sister courts that under the applicable version of Article 37, UCMJ, Appellant is required to demonstrate material prejudice in order to obtain relief. However, under either the actual UCI or the apparent UCI standard, Appellant has failed to make the required initial showing of some evidence that UCI occurred. The paragraph in question is prefaced with the statement that "[a]n investigation revealed" SB had "knowledge" of an alleged offense. In context, the convening authority was simply conveying his understanding of information SB had previously provided to the investigators. The convening authority's specific direction to SB, as stated in the second paragraph, was to "answer questions posed to you by investigators and counsel pertaining to . . . and to testify at any proceeding held pursuant to the UCMJ . . . concerning the matters and military member's [sic] identified in Paragraph 1." The third paragraph warned SB that, *inter alia*, he could be punished for perjury or making false statements. Considering the totality of the circumstances, we are not persuaded that SB or any objective, disinterested, fully informed observer would perceive the convening authority was attempting to improperly manipulate the military justice process by coercing SB to provide anything other than truthful responses to questions posed by investigators or counsel regarding the identified matters. Finally, assuming *arguendo* Appellant made a sufficient initial showing of UCI, we conclude beyond a reasonable doubt that Prosecution Exhibit 6 neither affected the findings or sentence nor, to the extent apparent UCI doctrine still applies, put an intolerable strain on the public's perception of the fairness of the military justice system.

## G. Prosecutorial Misconduct

### 1. Additional Background

Before the court members were assembled, the military judge held a closed hearing pursuant to Mil. R. Evid. 412 to address a defense motion to admit

evidence of other sexual behavior involving the victim, JC.[12] At the hearing, JC testified regarding an incident in April 2016 when she had been one of several people sleeping in the living room of an apartment. JC testified she had awakened on the sofa to find a male member of the group with his hand inside her pants and underwear, touching but not penetrating her vagina. JC asked him what he was doing, "shoved him away," and moved to the floor of the room, after which nothing further transpired. The military judge ultimately denied the Mil. R. Evid. 412 motion, and this evidence was not introduced at trial.[13]

The following colloquy took place during trial counsel's direct examination of JC:

> Q. [Trial Counsel] Okay. Now, you mentioned that you essentially woke up because you felt [Appellant's] fingers inside of you. Can you describe for us that sensation of waking up?
>
> A. [JC] Yeah. I was really taken aback and shocked. I couldn't speak. I couldn't say anything. And I was just kind of like why is this happening and I needed to get out of there.
>
> Q. Prior to that had you ever sort of been maybe startled out of your sleep before?
>
> A. Not to that nature, no.
>
> Q. But you understand that feeling?
>
> A. Yes, sir.
>
> Q. And was that a similar sort of feeling that you had when the accused did this to you?
>
> A. Yes.
>
> Q. Being startled awake?
>
> A. Yes, sir.

Trial counsel's closing argument on findings included the following:

> [JC] remembers getting ripped out of her sleep. She's had that sensation before, that sensation of getting pulled out of her sleep

---

[12] The trial record, transcript, appellate exhibits, and briefs related to the Defense's Mil. R. Evid. 412 motion were sealed pursuant to R.C.M. 1113. These portions of the record and briefs remain sealed, and any discussion of sealed material in this opinion is limited to that which is necessary for our analysis. *See generally* R.C.M. 1113.

[13] Appellant does not allege on appeal that the military judge erred by denying the Mil. R. Evid. 412 motion.

by something external, but as she said, never to that degree. *Because she has never been sexually assaulted before while she is asleep*. Waking up to that feeling is burned in her memory. In that moment her mind focuses on what is most important to her, which is her own physical safety and autonomy, which is why that is so ingrained in her memory, by that fact, the fact that there were his fingers in her vagina is burned into her mind. She told you it was so traumatic that she couldn't actually move. She actually froze. Fight, flight, or freeze; and she froze maybe for up to 30 seconds while this is happening to her. It's to the point to where she can't even speak. And she lies there. At some point she gathers herself enough that she pushes him away and gets up off the air mattress, and she immediately goes into the bathroom and texts her friend "help." She texts her friend help because she has just been sexually assaulted.

(Emphasis added.)

Trial defense counsel did not object to this portion of the Government's argument, and the military judge did not *sua sponte* interrupt it or provide specific instructions regarding it.

### 2. Law

"We review prosecutorial misconduct and improper argument de novo and where . . . no objection is made, we review for plain error." *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citing *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018)). "Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (citation omitted). The burden of proof under a plain error review is on the appellant. *See United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citation omitted).

"Improper argument is one facet of prosecutorial misconduct." *Id.* (citation omitted). "Prosecutorial misconduct occurs when trial counsel 'overstep[s] the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense.'" *United States v. Hornback*, 73 M.J. 155, 159 (C.A.A.F. 2014) (alteration in original) (quoting *Fletcher*, 62 M.J. at 178). Such conduct "can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, [for example], a constitutional provision, a statute, a [*Manual for Courts-Martial*] rule, or an applicable professional ethics canon." *Id.* at 160 (quoting *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996)). Trial counsel is entitled "to argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence."

*United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000) (citation omitted). However, "trial counsel is . . . prohibited from injecting into argument irrelevant matters, such as . . . facts not in evidence." *United States v. Schroder*, 65 M.J. 49, 58 (C.A.A.F. 2007) (citing *Fletcher*, 62 M.J. at 180) (additional citation omitted).

Relief for improper argument will be granted only if the trial counsel's misconduct "actually impacted on a substantial right of an accused (*i.e.*, resulted in prejudice)." *Fletcher*, 62 M.J. at 178 (quoting *Meek*, 44 M.J. at 5). "A prosecutorial comment must be examined in light of its context within the entire court-martial." *United States v. Carter*, 61 M.J. 30, 33 (C.A.A.F. 2005) (citation omitted). "[P]rosecutorial misconduct by a trial counsel will require reversal when the trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone." *Fletcher*, 62 M.J. at 184. In assessing prejudice from improper argument, we balance three factors: (1) the severity of the misconduct; (2) the measures, if any, adopted to cure the misconduct; and (3) the weight of the evidence supporting the conviction. *Id.*

### 3. Analysis

Appellant contends trial counsel's assertion that JC "ha[d] never been sexually assaulted before while she is asleep" was, in light of JC's Mil. R. Evid. 412 motion testimony, a false statement of a material fact. The Government responds that JC's testimony—specifically, that she had not previously been startled awake in the same "nature" as Appellant's sexual assault—supports trial counsel's argument as "an accurate summary of the sensation JC described." The Government further argues trial counsel's argument was not "false" because the commission of a "sexual assault" under Article 120, UCMJ, requires the commission of a "sexual act," and a sexual act involving contact with the fingers would require penetration. *See* 10 U.S.C. § 920(a), (b), and (g)(1). Put another way, JC's motion testimony described an instance of abusive sexual contact rather than sexual assault. Accordingly, the Government contends, Appellant's argument fails.

We conclude that, at a minimum, trial counsel argued facts not in evidence and therefore his argument was plainly improper. Fine distinctions between sexual assault and abusive sexual contact aside, JC did not testify that she had never been sexually assaulted while she was asleep. She merely testified that she had not been "startled" awake in the same "nature" as she was when she awoke in SSgt BS's living room after the October 2017 Halloween party. The fact that the Government had successfully opposed a defense motion to introduce evidence of the unrelated but factually quite similar incident in April 2016 should have made trial counsel's erroneous argument all the more noticeable to counsel and the military judge.

Although in this case we do not need to find trial counsel's argument false per se in order to find it plainly erroneous, we pause to emphasize that Mil. R. Evid. 412 is not a sword for the prosecution. We believe most court members would likely consider the April 2016 incident, as JC described it, to be an allegation of a "sexual assault" as that term is commonly used and understood. We note Congress entitled Article 120, UCMJ, which criminalizes abusive sexual contact, "Rape and sexual assault generally." For the Government to successfully oppose such evidence, and then make factual assertions in argument to the effect that no such evidence existed, was misleading at best.

Having found plain or obvious error, we next assess prejudice. Applying the three-factor balancing test set forth in *Fletcher* and considering the record as a whole, we are confident the error did not materially prejudice Appellant's substantial rights or the integrity of his trial. *See Fletcher*, 62 M.J. at 184. First, we find the error was not severe. The erroneous assertion was a single sentence in a lengthy closing argument. Trial counsel did not belabor the comment, which perhaps reflected a momentary lapse. In addition, and more importantly, the assertion was simply not very material in the context of Appellant's argument as a whole or in light of all the evidence. Whether JC had or had not previously been sexually assaulted in her sleep was not, in itself, probative of whether Appellant committed the charged offense. Trial counsel's comment apparently served to emphasize that this was a shocking, memorable event for JC, and that her description of it was reliable. However, we doubt the members would have considered the sexual assault substantially less shocking or memorable to JC simply because she had experienced a prior incident of abusive sexual contact or sexual assault. Moreover, trial counsel made the same point more effectively by referring to JC's actual testimony as to how she reacted after she awoke: she felt Appellant's fingers in her vagina; she froze for approximately 30 seconds; she then pushed Appellant away and fled to the bathroom, where she texted JL for help. Thus, the error was not of a nature to substantially distort the court members' assessment of the evidence.

As to the remaining *Fletcher* factors, as described above, we find the evidence supporting Appellant's conviction was strong, based on JC's credible testimony, reinforced by her reactions and observed behavior after the assault; her prior consistent statements; the absence of a persuasive motive to fabricate the allegation; and Appellant's admission that he was afraid he might have inappropriately touched JC. The Defense's case was correspondingly weak. In the absence of an objection, the military judge did not provide any specific corrective instruction; however, the fact that trial defense counsel did not object to this statement is some indication of its immateriality. *See United States v. Gilley*, 56 M.J. 113, 123 (C.A.A.F. 2001) (citation omitted). In light of the foregoing considerations, trial counsel's erroneous comment was not so damaging

as to call into question whether the members convicted Appellant on the basis of the evidence alone. *See Fletcher*, 62 M.J. at 184.

## H. Ineffective Assistance of Counsel

### 1. Additional Background

Appellant asserts trial defense counsel were ineffective in four respects related to issues discussed above: (1) failure to research or request a proper instruction on the affirmative defense of involuntary intoxication; (2) failure to appreciate the prejudicial effect of human lie detector evidence and failure to request a limiting instruction; (3) failure to appreciate the prejudicial effect of evidence of Appellant's prior administrative discharge board waiver and failure to request a limiting instruction; and (4) failure to object to trial counsel's improper closing argument.[14] The background for each of these assertions is described in the respective subsections above.

This court ordered and received sworn declarations from Appellant's trial defense counsel, Captain (Capt) CF and Capt AP, responsive to Appellant's claims of ineffective assistance, which we have considered in relation to these issues. *See United States v. Jessie*, 79 M.J. 437, 442–44 (C.A.A.F. 2020). We address each of Appellant's assertions in turn in our analysis below.

### 2. Law

The Sixth Amendment guarantees an accused the right to effective assistance of counsel. *Gilley*, 56 M.J. at 124. In assessing the effectiveness of counsel, we apply the standard in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citation omitted). We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009) (citation omitted). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *Mazza*, 67 M.J. at 474).

We utilize the following three-part test to determine whether the presumption of competence has been overcome: (1) are the appellant's allegations true, and if so, "is there a reasonable explanation for counsel's actions;" (2) if the allegations are true, did trial defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers;" and (3) if trial defense counsel were ineffective, is there "a reasonable probability

---

[14] With respect to assertion (4), see note 12, *supra*.

that, absent the errors," there would have been a different result? *Id.* (alteration and omission in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

The burden is on the appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted). "[C]ourts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting *Strickland*, 466 U.S. at 689). With respect to prejudice, a "reasonable probability" of a different result is "a probability sufficient to undermine confidence in the outcome" of the trial. *Id.* (quoting *Strickland*, 466 U.S. at 694).

### 3. Analysis

#### a. Involuntary Intoxication

Appellant contends the record reflects that trial defense counsel, like the military judge and trial counsel, "had no idea the affirmative defense of involuntary intoxication even existed." Therefore, he argues, trial defense counsel had not analyzed the issue nor made a knowing and intelligent decision whether to seek an instruction on the defense. Appellant further argues their decision to "simply go along with the guesswork" by the military judge and trial counsel fell measurably below the expected standard of performance. Appellant asserts the evidence of involuntary intoxication was "far from insignificant," and claims he was prejudiced by the military judge's failure to give a proper instruction because of "a reasonable probability the members would have acquitted" him on that basis.

Trial defense counsel respond that they made a conscious decision not to pursue a strategy based on involuntary intoxication because Appellant had disclosed to them that he might have voluntarily ingested illegal drugs that night, but could not remember—and they wanted to "steer clear" of possibly bringing such evidence to light.[15] Trial defense counsel further stated they recognized voluntary intoxication was relevant, and they were satisfied with the instruction given by the military judge.

We find Appellant has failed to meet his burden to demonstrate he is entitled to relief on this basis. We acknowledge Appellant's point that trial defense

---

[15] Appellant asserts the inclusion of this information in trial defense counsel's declarations exceeds the scope of his claim of ineffective assistance. We disagree. Both trial defense counsel cite this information as a reason why they did not pursue a defense based on involuntary intoxication, to include why they did not seek such an instruction, and it was therefore responsive to the assignment of error. Whether it was a good reason is a distinct question.

counsel's stated concern regarding possible evidence that Appellant voluntarily abused drugs at the party would seem to be minimized once both parties had rested their case for findings. However, assuming *arguendo* that the failure to request an instruction on the affirmative defense of involuntary intoxication fell measurably below the standard of performance, Appellant has failed to demonstrate a reasonable probability of a more favorable result had the instruction been given. As described above, the evidence that Appellant was involuntarily intoxicated by a drug such that he unable to appreciate either the nature and quality or the wrongfulness of his actions when he penetrated JC's vagina with his fingers was exceptionally weak, amounting to little more than self-serving speculation on Appellant's part. Accordingly, the omission of the instruction does not undermine our confidence in the outcome of the trial.

### b. Human Lie Detector Evidence

Appellant contends trial defense counsel were ineffective when they "acquiesce[d]" to the Government's admission of Appellant's recorded AFOSI interview without requesting a limiting instruction. Appellant acknowledges trial defense counsel's evident strategy of putting the entire interview before the court members in order to portray the investigators as biased. However, he asserts the fact that trial defense counsel did not request a limiting instruction indicates they failed to recognize the prejudicial impact, and therefore the strategy was not the product of a "reasoned decision." He concludes the admission of such evidence of the investigators' belief in the allegations and disbelief of Appellant, without a contemporaneous limiting instruction from the military judge, resulted in a fundamentally unfair trial.

In response, trial defense counsel affirmed their strategic decision to introduce the entire interview in an effort to show that the investigators were biased, that the investigators tried to influence Appellant's answers during the interview, and that Appellant stood by his account even under pressure. Capt AP notes he argued these points at some length in the Defense's closing argument. Trial defense counsel aver the defense team made a reasoned decision to pursue this strategy, after conferring with their expert consultants and weighing the risks and benefits. Trial defense counsel assert the risk of prejudice was not great because, in context, it was clear the investigators were using an interrogation technique "commonly known by society," rather than functioning as surrogate truth finders for the court members. Finally, Capt AP asserts trial defense counsel "did not request a specific limiting instruction because we believed the judge's credibility instruction was sufficient."

We conclude Appellant has failed to demonstrate either deficient performance or prejudice as to human lie detector evidence. Applying the strong presumption of competence, we find trial defense counsel's decision to allow the admission of Appellant's entire interview was a reasonable strategic decision

in order to portray the investigators as biased, to cope with damaging or implausible statements Appellant made during the interview, and to highlight the consistency of Appellant's responses in order to make him appear more credible. We are not persuaded by Appellant's argument that the fact that the Government, rather than the Defense, first proposed including Investigator SC in the credibility instruction demonstrates trial defense counsel did not make a reasoned decision. Ultimately, an appropriate limiting instruction was given to the court members, and trial defense counsel did not fail to obtain one. As discussed above in relation to the alleged instructional error, in light of Investigators SC's testimony that she had not formed an opinion as to whether Appellant was guilty, coupled with the military judge's instruction, we are confident the court members did not use the investigators' statements during the AFOSI interview as a surrogate for their own fact-finding role. We perceive no prospect that an earlier limiting instruction with respect to Prosecution Exhibit 1 would have altered the trial's outcome.

### c. Administrative Discharge Board Waiver

Appellant asserts trial defense counsel were ineffective by allowing the court members to receive evidence of his administrative discharge board waiver without a limiting instruction. He acknowledges trial defense counsel made a strategic decision to elicit evidence that Appellant was originally facing a discharge board and JC became angry after he waived it and decided to participate in the criminal investigation, in order to portray JC as unreasonable and vindictive. However, he contends the failure to at least request a limiting instruction was not a reasonable strategic decision, which unfairly prejudiced him because it left open the possibility the court members would view the waiver as an admission.

In response, Capt AP confirmed the strategy was to use JC's reaction to Appellant's board waiver to portray her as bitter and spiteful, which they felt would help Appellant's case. According to Capt AP, trial defense counsel believed the benefits outweighed the risks because Appellant's waiver could be understood as him "just not wanting to take the risk of a court-martial" rather than a "quasi-admission" of guilt. With regard to seeking a limiting instruction, Capt AP explained "in full candor" they "did not think to do so, since [JC's] testimony fit [the Defense's] narrative and [they] believed could be better instead contextualized in argument." For her part, Capt CF stated,

> [L]ooking back, this was improper evidence to elicit. However, in the heat of trial, we did not believe there was a need for a limiting instruction since a discharge board waiver is not an admission of guilt and it was only briefly mentioned in trial to show the complaining witness's character of being vindictive and attention-seeking.

In light of Capt AP's concession that trial defense counsel "did not think" to request a limiting instruction, and Capt CF's concession that it was "improper" to elicit evidence of the discharge board waiver, we accept for purposes of analysis that trial defense counsel's performance fell measurably below the applicable standard.

Accordingly, we turn to prejudice. It is a close question. We acknowledge a limiting instruction would have been appropriate. However, we conclude Appellant has not met his burden to demonstrate a probability of a different result sufficient to undermine our confidence in the outcome of the trial. As we have noted several times, the Government's case was strong. JC provided credible testimony that she awoke to find Appellant aggressively penetrating her vagina with his fingers without her consent. This testimony was supported by her reactions to the incident, which she testified to and which were substantially confirmed by other witnesses and evidence. The Government introduced several prior statements by JC which were generally consistent with her trial testimony. In his interview, Appellant confirmed he was lying next to JC on the air mattress; although he claimed he could not remember what happened, he "feared" he might have inappropriately touched her. Moreover, a waiver of a discharge board is not, in itself, an admission of guilt. The court members in this case did not have evidence of the reasons Appellant waived the discharge board. Viewed in light of the evidence as a whole, the court members would have known, however, that when Appellant waived the discharge board he was quite aware of the AFOSI's sexual assault investigation. Waiving a discharge board could have accelerated Appellant's administrative separation from the Air Force, removing the threat of the investigation and a potential court-martial regardless of Appellant's belief in his innocence or guilt. We remain confident the court members convicted Appellant based on the evidence of the sexual assault rather than Appellant's prior decision not to contest a discharge board.

### d. Trial Counsel's Improper Argument

Appellant asserts trial defense counsel were ineffective by failing to object to trial counsel's allegedly false assertion during closing argument that JC "ha[d] never been sexually assaulted before while she is asleep." For their part, trial defense counsel agreed trial counsel's comment was improper, but considered it insignificant to the case as a whole. In our analysis above, we concluded trial counsel's comment did not materially prejudice Appellant's substantial rights. For similar reasons, without deciding the question of deficient performance, we find Appellant has not demonstrated that an objection by trial defense counsel would have generated a reasonable probability of a different result. Therefore, no relief is warranted.

**I. Sentence Credit for Prior Nonjudicial Punishment**

**1. Additional Background**

On 29 March 2019, Appellant received nonjudicial punishment from his squadron commander, pursuant to Article 15, UCMJ, for two offenses: (1) wrongful use of 3,4-Methylenedioxymethamphetamine (Ecstasy) between on or about 1 October 2017 and on or about 31 October 2017, in violation of Article 112a, UCMJ, 10 U.S.C. § 812a; and (2) sexual assault of JC on or about 27 October 2017 by penetrating her vulva with his fingers while she was asleep, unconscious, or otherwise unaware, in violation of Article 120, UCMJ. The second of these offenses was substantially the same offense for which he was subsequently tried by a general court-martial, and that is the subject of the instant appeal, albeit charged under a different theory of culpability. Appellant's squadron commander found Appellant committed both offenses and imposed a reduction from the grade of E-4 to E-1, restriction to the limits of Maxwell AFB and Gunter Annex for 60 days, and a reprimand.

At Appellant's court-martial, trial counsel offered the record of the nonjudicial punishment action (Article 15) as part of Prosecution Exhibit 7 for consideration by the court members in presentencing proceedings. Trial defense counsel did not object, and the military judge admitted the exhibit.

After additional discussions between the military judge and counsel regarding exhibits and sentencing instructions, the following exchange occurred:

> DC: And, Your Honor, I would note -- I'm not sure the appropriate time to note this, but as part of his Article 15, he was punished for the same offense for which he was prosecuted here in this trial, and he received 60 days restriction from that Article 15. I'm not sure if that's -- well, I just want to make you aware of that.

> MJ: Okay. You want to make me aware of that in what regard? How do you see that as relevant?

> DC: May I have a moment?

> . . . .

> DC: Your Honor, we intend to offer that as a matter of mitigation in terms of an appropriate sentence.

> MJ: Okay. Let's put a pin in it and turn back to that shortly.

After the court members announced their findings, the parties presented their evidence for sentencing, and counsel made their sentencing arguments, the military judge discussed with the parties sentencing instructions on matters in aggravation, extenuation, and mitigation. Among other matters, trial

defense counsel requested the military judge instruct the members that pursuant to his Article 15, beginning on 29 March 2019 Appellant had been restricted to the limits of Maxwell AFB and Gunter Annex for 60 days. Trial counsel objected that the requested instruction "would mislead the members and make them think that [Appellant] should get credit for the full 60 days when at least some of that would've been" for the drug abuse in violation of Article 112a, UCMJ. After some discussion with trial defense counsel, the military judge ultimately drafted an instruction with respect to the prior Article 15 punishment, stating the court members "should consider," *inter alia*, "the prior Article 15 [and] that [Appellant] was previously restricted to certain limitations for approximately 60 days as a result of a 29 March 2019 Article 15, which partially stemmed from conduct that has been the subject of this court[-martial] . . . ." When the military judge asked counsel whether they objected to the sentencing instructions or requested any additions, trial defense counsel responded, "No, Your Honor." After the military judge read the sentencing instructions to the court members, he again asked counsel whether they objected to the instructions given or requested additional instructions. Trial defense counsel again replied, "No, Your Honor."

**2. Law**

"Under regulations of the Secretary concerned, trial counsel may obtain and introduce from the personnel records of the accused evidence of the accused's . . . character of prior service. Such evidence includes . . . any disciplinary actions including punishments under Article 15[, UCMJ]." R.C.M. 1001(b)(2).

Article 15(f), UCMJ, 10 U.S.C. § 815(f), provides:

> The imposition and enforcement of disciplinary punishment under this article for any act or omission is not a bar to trial by court-martial for a serious crime or offense growing out of the same act or omission, and not properly punishable under this article; but the fact that a disciplinary punishment has been enforced may be shown by the accused upon trial, and when so shown shall be considered in determining the measure of punishment to be adjudged in the event of a finding of guilty.

"Article 15(f)[, UCMJ,] leaves it to the discretion of the *accused* whether the prior punishment will be revealed to the court-martial for consideration on sentencing." *United States v. Pierce*, 27 M.J. 367, 369 (C.M.A. 1989).

> The accused, as gatekeeper, may choose whether to introduce the record of a prior NJP [nonjudicial punishment] for the same act or omission covered by a court-martial finding and may also choose the forum for making such a presentation. The accused

> may: (1) introduce the record of the prior NJP for consideration by the court-martial during sentencing; (2) introduce the record of the prior NJP during an Article 39(a), UCMJ, 10 USC § 839(a), session for purposes of adjudicating credit to be applied against the adjudged sentence; (3) defer introduction of the record of the prior NJP during trial and present it to the convening authority prior to action on the sentence; or (4) choose not to bring the record of the prior NJP to the attention of any sentencing authority.

*United States v. Gammons*, 51 M.J. 169, 183 (C.A.A.F. 1999).

The proper application of credit for pretrial punishment is a question of law we review de novo. *Cf. United States v. Spaustat*, 57 M.J. 256, 260 (C.A.A.F. 2002) ("The proper applications of credit for illegal pretrial punishment and lawful pretrial confinement are questions of law, reviewed de novo."); *see also United States v. Santizo*, ARMY 20100146, 2011 CCA LEXIS 152, at *6 (A. Ct. Crim. App. 31 Aug. 2011) (unpub. op.) (reviewing proper allocation of *Pierce* credit de novo). Failure to timely assert a right is forfeiture; we review forfeited issues for plain error. *Ahern*, 76 M.J. at 197.

### 3. Analysis

Appellant contends the military judge erroneously permitted the Government to introduce the Article 15 punishment as part of Prosecution Exhibit 7, when under *Pierce* and *Gammons* Appellant was the gatekeeper for such evidence. Appellant further argues he was denied the "additional right to have the military judge determine the actual credit he should receive," rather than an "intentionally vague" instruction to the court members to consider the prior Article 15 punishment as a mitigating factor.

As an initial matter, the Government contends Appellant waived this assignment of error in light of *United States v. Haynes*, 79 M.J. 17 (C.A.A.F. 2019). In *Haynes*, the appellant received nonjudicial punishment under Article 15, UCMJ, for *inter alia* wrongfully using marijuana on divers occasions during a period that overlapped by 11 days a pending preferred charge of wrongful use of marijuana on divers occasions. *Id.* at 19. As a result, the appellant contended on appeal that he was entitled to *Pierce* credit from the Article 15 punishment against his court-martial sentence. *Id.* The CAAF disagreed. *Id.* at 20. The court noted that when the military judge asked counsel whether the appellant was "to be credited with 107 days of pretrial confinement credit," trial defense counsel responded, "Yes, Your Honor." *Id.* at 19. Acknowledging but brushing aside the possibility that the military judge could have been understood to be referring specifically to credit for pretrial confinement pursuant to *United States v. Allen*, 17 M.J. 126, 127 (C.M.A. 1984), the majority opinion explained that "*Pierce* credit has long been considered a form of confinement credit," and

interpreted the military judge's question broadly to refer to "confinement credit in the broad sense," including *Pierce* credit. *Haynes*, 79 M.J. at 19–20. Thus, the majority held, trial defense counsel's agreement that the appellant was entitled to 107 days of pretrial confinement credit affirmatively waived any claim for sentence credit under *Pierce. Id.* at 20.

The Government contends that in Appellant's case, as in *Haynes*, trial defense counsel "expressly stated that Appellant was not entitled to any pretrial confinement credit." We disagree. The military judge did ask counsel whether Appellant was "to be credited with 0 days of pretrial confinement." However, unlike *Haynes*, the military judge did not refer to "pretrial confinement *credit*," which was essential to the finding of waiver in *Haynes*. Equally significant, although *trial counsel* responded, "Yes, Your Honor," the record does not reflect that *trial defense counsel* responded to the military judge's question at all. Accordingly, *Haynes* does not dictate a conclusion that Appellant waived this issue.

Although *Haynes* does not control, the question remains as to what standard of review we should apply. We understand Appellant's assignment of error to involve two interrelated aspects: first, trial counsel's usurpation of Appellant's gatekeeper role with respect to the use of the prior Article 15; and second, the military judge's failure to determine an actual credit against the adjudged sentence, rather than merely provide an instruction for the members' deliberations on the sentence. The Defense affirmatively did not object to Prosecution Exhibit 7, nor comment on the military judge's failure to specifically inquire about Appellant's options with respect to the prior Article 15 in accordance with *Gammons* before admitting it into evidence. Failure to assert a right generally constitutes forfeiture, which we test for plain error. We recognize there is a potential argument that trial defense counsel's decision not to object to Prosecution Exhibit 7, coupled with the announcement that the Defense intended to use Appellant's prior punishment as a matter in mitigation, reflected an intent to waive any alternative approach under *Gammons*—including waiver of having the military judge determine a specific quantum of credit. However, in the absence of any specific discussion or reference to Appellant's various rights under *Gammons*, and recognizing our authority to pierce waiver in order to ensure an appellant has not been materially prejudiced by a legal error, we review for plain error. *See Hardy*, 77 M.J. at 443.

Therefore, the burden is on Appellant to show an error that was plain, clear, or obvious, and that materially prejudiced his substantial rights. *See Maynard*, 66 M.J. at 244 (citations omitted). The Defense did not object to Prosecution Exhibit 7. The record does not indicate the military judge was previously aware that the Article 15 action included therein was, in part, for the

same offense charged at the court-martial—until trial defense counsel subsequently brought the issue to his attention. Trial defense counsel then indicated the Defense intended to "offer" the prior punishment as a matter in mitigation. Such an approach was the first of the four options available to an accused when an Article 15 punishes the same act covered in a court-martial finding, as the CAAF explained in *Gammons*. The better practice may have been for the military judge, upon learning Appellant had previously received Article 15 punishment, in part, for the same offense for which he was to be sentenced, to specifically inquire regarding the Defense's preference among the alternatives under *Gammons*; however, we cannot say he plainly, clearly, or obviously erred by allowing the court-martial to proceed in accordance with Defense's apparent intent.

Assuming *arguendo* the military judge did clearly err, we are not persuaded such an error materially prejudiced Appellant's substantial rights. Using the prior Article 15 punishment as a matter in mitigation was a valid alternative under *Gammons*. *See also* R.C.M. 1001(d)(1)(B). Under the circumstances of this case, there were sound tactical reasons why such an approach may have worked to Appellant's advantage. For example, trial defense counsel could have considered the fact that Appellant was originally to receive only nonjudicial punishment and an administrative discharge might tend to downplay the severity of the offense in the minds of the court members.

Accordingly, we find Appellant is not entitled to relief.

## J. Cumulative Error

The doctrine of cumulative error provides that "a number of errors, no one perhaps sufficient to merit reversal, [may] in combination necessitate" relief. *United States v. Banks*, 36 M.J. 150, 170–71 (C.M.A. 1992) (quoting *United States v. Walters*, 16 C.M.R. 191, 209 (C.M.A. 1954)). However, "[a]ssertions of error without merit are not sufficient to invoke this doctrine." *United States v. Gray*, 51 M.J. 1, 61 (C.A.A.F. 1999). As described above, we have found the majority of Appellant's assertions of error to be without merit. We have either found or assumed for purposes of analysis that errors occurred with respect to three matters: (1) trial counsel's closing argument; (2) trial defense counsel's failure to request an instruction on involuntary intoxication; and (3) trial defense counsel's elicitation of evidence of Appellant's discharge board waiver without a limiting instruction. We note that these alleged errors are not closely related, and only the third presents a relatively close question with respect to prejudice. We have considered the cumulative effect of each of these alleged errors and we conclude that, in combination, they do not warrant reversal of Appellant's conviction.

## III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court